# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Fall 2024 Term

_____

No. 23-ICA-409

_____

FILED

**December 12, 2024**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

WEST VIRGINIA MUTUAL INSURANCE COMPANY,
Plaintiff/Counterclaim Defendant Below, Petitioner

v.

STEVEN R. MATULIS, M.D.,
Defendant/Counterclaim Plaintiff Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer F. Bailey, Judge
Civil Action No. 17-C-748

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED
_____

Submitted: September 25, 2024
Filed: December 12, 2024

Marc E. Williams, Esq.                 J. Zak Ritchie, Esq.
Robert L. Massie, Esq.                 Isaac R. Forman, Esq.
Shaina D. Massie, Esq.                 Michael B. Hissam, Esq.
Nelson Mullins Riley & Scarborough LLP  Hissam Forman Donovan Ritchie PLLC
Huntington, West Virginia              Charleston, West Virginia
Counsel for Petitioner                 Counsel for Respondent

CHIEF JUDGE SCARR delivered the Opinion of the Court.

JUDGE LORENSEN concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

SCARR, CHIEF JUDGE:

Petitioner West Virginia Mutual Insurance Company ("Mutual"), appeals seven orders of the Circuit Court of Kanawha County: (1) the May 4, 2021, Memorandum Opinion and Order; (2) the May 12, 2023, Memorandum Opinion and Order; (3) the May 12, 2023, Order Granting Dr. Matulis' Motion in Limine Concerning Sexual Misconduct; (4) the June 6, 2023, Partial Judgment Order; (5) the August 15, 2023, Memorandum Opinion and Order; (6) the August 18, 2023, Order Denying WVMIC's [Mutual's] Renewed Motion for Judgment as a Matter of Law or, In the Alternative, For a New Trial; and (7) the September 1, 2023, Order Awarding Attorneys' Fees Under *Hayseeds*, Dismissing Remaining Claims and Final Judgment Order.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' written and oral arguments, the record on appeal, and the applicable law, we affirm in part, reverse in part, vacate in part, and remand for additional proceedings consistent with this opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Mutual issued a medical professional liability insurance policy to Charleston Gastroenterology Associates, PLLC ("CGA"), Policy Number PL002028 ("the Policy"). The Policy was effective from July 1, 2015, to July 1, 2016. Respondent Steven R. Matulis, M.D. ("Matulis"), who at the time was a physician at CGA, was named as an

1

insured under the Policy, with coverage limits of $1,000,000 for each medical incident and $3,000,000 in annual aggregate coverage. Pursuant to an Extended Reporting Endorsement, coverage for Matulis was retroactively extended back to July 1, 1994.

Under the Policy, Mutual agreed to:

pay those sums that the insured becomes legally obligated to pay as damages because of a claim that is a result of a medical incident which occurs on or after the retroactive date applicable to such insured and which is first reported by the insured during the policy period. [Mutual] has the right and duty to defend any claim or suit seeking those damages; however, [Mutual] has no duty to defend any claim, or suit which seeks damages to which this insurance does not apply.

The Policy defines "medical incident" as:

any act, series of acts, failure to act, or series of failures to act arising out of the rendering of, or failure to render, professional services, to any one person by an insured or any person not otherwise excluded for whose acts or omissions an Insured is legally responsible which results in damages, claim, or suit[.]

The Policy defines "professional services" as "the providing of medical services, including medical treatment, which the insured is licensed to perform." The Policy also includes a series of exclusions. Specifically, the Policy provides that Mutual would not defend or pay for:

liability arising out of sexual acts or sexual activities whether under the guise of professional services or not, on the part of any insured, or any person for whose acts or omissions any insured is legally responsible; or

2

> injury or damage resulting from a medical incident which is also a willful violation of a statute, ordinance or regulation imposing criminal penalties; or
>
> ….
>
> any claim or suit arising out of an intentional tort, dishonest, reckless or malicious act, or breach of contract except as otherwise provided in this policy[.]

The Policy also includes a "Broad Form Administrative Defense Endorsement," which provides that "[w]e will provide a legal expense benefit for proceedings instituted against You before a regulatory or administrative entity arising out of Your professional practice, while You are insured under the Policy to which this endorsement attaches." This endorsement provides that "You need to notify us within thirty (30) days from the date of an Administrative Defense Proceeding being instituted in order to receive coverage under this Additional Benefit."

Beginning in April 2016, various former patients began filing lawsuits against Matulis and CGA. The plaintiffs in these suits alleged various causes of action, but the claims against Matulis were generally based on very specific allegations that he had put his fingers in plaintiffs' vaginas or touched their breasts while they were under anesthesia for colonoscopies or other procedures. Some of the plaintiffs' complaints included allegations that Matulis had sexually assaulted or abused them, or that his actions constituted sexual misconduct. Other plaintiffs characterized his actions as digital vaginal exams ("DVEs") or breast exams performed without informed consent in a breach of the

3

standard of care. The claims against CGA generally consisted of allegations of negligent supervision and failure to intervene. Thirteen lawsuits filed in the Circuit Court of Kanawha County, including two class actions, were consolidated for purposes of discovery and pretrial matters under Civil Action No. 16-C-497. Matulis sought a defense to these lawsuits from Mutual pursuant to the Policy. Mutual provided a defense under a reservation of rights in four cases but refused to defend him in the other nine.

On May 30, 2017, Mutual initiated this matter by filing a complaint for declaratory relief in the Circuit Court of Kanawha County, seeking a declaration that it had no duty to defend or indemnify Matulis or CGA in several of these suits. Mutual filed an amended complaint on September 28, 2018, adding some of the plaintiffs in the underlying actions as defendants. Mutual filed a second amended complaint on March 15, 2019, naming as defendants all of the underlying plaintiffs with pending lawsuits against Matulis and CGA and another matter where a notice of claim had been filed.[1] Mutual contended that the plaintiffs' claims were not covered by the Policy because Matulis' alleged acts did not satisfy the Policy's definitions of "medical incidents" or "professional services." Mutual also argued that the claims were excluded under the Policy's exclusions for sexual acts and activities, criminal acts, and intentional torts. On April 15, 2019, Matulis filed an answer to the second amended complaint, which included counterclaims against Mutual

---

[1] Mutual also named L.B., a former patient of Matulis who had filed a notice of claim but not a lawsuit and sought a declaration that it had no duty to defend or indemnify as to L.B.'s claims.

for breach of contract, bad faith, and damages under *Hayseeds, Inc. v. State Farm Fire & Cas.*, 177 W. Va. 323, 352 S.E.2d 73 (1986).

Matulis was criminally indicted on June 1, 2018, on seven felony counts stemming from his sexual abuse of unconscious patients. Following a five-day trial, a jury found him guilty of sexual abuse in the first degree on a count relating to fondling the breasts of T.W. on October 5, 2018. He was acquitted on all counts involving DVEs. Matulis was sentenced to not less than one and up to five years in prison and assessed a $10,000 fine. He also was ordered to register as a sex offender and given five years of extended supervision. Matulis' conviction and sentence were affirmed on appeal. *See State v. Matulis*, No. 18-1053, 2020 WL 1487810, at *6 (W. Va. Mar. 23, 2020) (memorandum decision). He spent fifteen months in prison because of his conviction for sexual abuse.

On July 8, 2019, Mutual filed a motion for partial judgment on the pleadings, seeking a ruling that it had no duty to defend or indemnify in any of the plaintiffs' tort cases because the alleged acts were not "medical incidents" or "professional services" and were excluded under the sexual acts and intentional tort exclusions.[2] CGA and a group of plaintiffs in the underlying tort actions filed responses. On February 7, 2020, Matulis filed a motion for partial summary judgment, seeking summary judgment solely on the issue of

---

[2] Although Mutual quoted the Policy's criminal acts exclusion in its supporting memorandum, it did not explicitly argue that exclusion in this motion.

Mutual's defense of him in nine of the thirteen lawsuits.[3] Mutual filed a response in opposition, and on February 17, 2021, the circuit court held a hearing on both motions.

On May 4, 2021, the circuit court entered an order granting Matulis' motion for partial summary judgment and denying Mutual's motion for partial judgment on the pleadings. The circuit court rejected Mutual's coverage arguments, focusing primarily on the intentional tort exclusion although recognizing that Mutual had "suggested" that coverage was also precluded by the sexual acts and criminal acts exclusions.[4] The circuit court noted that Matulis claimed that he performed limited DVEs on certain patients when he believed that they were medically appropriate. The circuit court concluded that, because the complaints alleged various legitimate negligence-based causes of action in addition to alleging intentional sexual misconduct, the plaintiffs might ultimately prevail on claims that fell within the policy. The circuit court rejected Mutual's argument that the negligence allegations in the complaint were merely an attempt to trigger coverage for otherwise uncovered claims:

> Based on the facts particular to these cases, the Court cannot agree that the underlying tort claimants have engaged in "artful pleading;" rather, they have alleged alternative theories of liability on which they may or may not ultimately prevail. Nevertheless, because some of these avenues for recovery may

---

[3] Matulis designated this motion as his response to Mutual's motion for partial judgment on the pleadings.

[4] In its opinion, the circuit court concluded that: "After considering the evidence and argument offered on all sides, the Court readily concludes that the underlying tort actions allege a variety of avenues for recovery, at least some of which, with evidentiary support, could give rise to covered claims not subject to **any** exclusion." (Emphasis added).

give rise to covered claims, the Mutual must provide its insureds with a defense to all of the claims, even though it might only be required to indemnify Dr. Matulis or CGA with respect to some of them.

The circuit court acknowledged that Matulis only sought summary judgment on the duty to defend nine of the lawsuits against him, but nevertheless denied Mutual's motion for partial judgment on the pleadings in all the pending lawsuits and claims.

The parties subsequently filed cross-motions for summary judgment on the issue of the damages sustained pursuant to Mutual's breach of the duty to defend. In its January 9, 2023, motion for partial summary judgment on this issue, Mutual sought a ruling that it was not liable for any attorney fees Matulis incurred in his administrative proceedings, in his criminal proceedings, in his coverage proceeding against Mutual, or any of his other matters because of the coverage language, policy exclusions, or late notice of claims.

Matulis filed his cross-motion for partial summary judgment on January 24, 2023. In that motion, Matulis explained that he had originally claimed $479,017.32 in fees incurred defending himself against the underlying tort claims. However, of that total, he recognized that Mutual had conceded that $212,100.80 was no longer in dispute under the circuit court's coverage ruling, and that he had withdrawn his claim for some other fees. Matulis noted that the only attorney fee amounts remaining in dispute were $129,423.65 related to the tort claims and $25,000 in administrative defense fees. Matulis sought

summary judgment as to both amounts and a ruling that he was entitled to prejudgment interest in the amount of $140,816.88.

On May 12, 2023, the circuit court entered an order granting Matulis' motion in part, finding that he was entitled to the uncontested $212,100.80 and the $25,000 in administrative defense fees. The circuit court rejected Mutual's argument that these administrative defense fees were unavailable due to Matulis' alleged failure to provide timely notice of the administrative proceedings.

The circuit court held its final pretrial conference on May 3, 2023, with trial scheduled for May 15, 2023. Following that conference, on May 12, 2023, the circuit court entered an order granting Matulis' motion in limine to exclude any evidence related to his sexual misconduct at the upcoming trial on the breach of contract and *Hayseeds* damages. The circuit court stated that it agreed with Matulis that the evidence concerning his sexual misconduct was not relevant to the breach of contract and *Hayseeds* issues.

On May 15, 2023, prior to commencement of trial, the circuit court announced that it intended to grant summary judgment to Matulis on the remaining contested amount of $129,423.65 for breach of contract damages. The circuit court also ruled that the jury would decide whether prejudgment interest should be awarded, but that the court would decide the amount of any such award. The case then proceeded to trial on *Hayseeds* damages. Prior to opening statements, the circuit court confirmed that its ruling

excluding evidence of sexual misconduct precluded Mutual from discussing Matulis' criminal proceedings, an investigation against him conducted by Charleston Area Medical Center ("CAMC"), and/or the Board of Medicine's ("BOM") investigation.

Matulis himself was the first witness called at trial. Matulis testified that he had paid premiums for malpractice insurance to Mutual for more than the last decade of his practice as a physician, but that when he was sued in 2016, they refused to defend him. He testified that he spent around $366,000 in out-of-pocket legal expenses, and that he had been compelled to sell his property on Lake Wylie in North Carolina in order to pay his attorneys. Matulis' counsel then specifically asked him about annoyance and inconvenience he had suffered due to Mutual. Matulis testified that he had not expected that Mutual would refuse to provide him a defense after he had paid premiums every year, that he had not anticipated that he would have to pay over $300,000 out of pocket, and that he would not have imagined having to sell property he had purchased to be near his children and grandchildren in retirement.

After his direct testimony, the circuit court held a bench conference, at which counsel for Mutual moved for permission to question Matulis about the facts and circumstances of those cases where Mutual had refused to defend him. Counsel argued that Matulis' testimony regarding his expectation that Mutual would pay for his defense had opened the door for Mutual to rebut his testimony with facts about those claims and why the defense was denied. The circuit court denied this motion. Counsel for Mutual then

9

cross-examined Matulis about his sale of the Lake Wylie property in October 2017. Following those questions, at another bench conference, counsel for Mutual moved for leave to introduce invoices demonstrating that Matulis had paid legal fees in other matters in the six months following the sale of the property. The circuit court denied this request.

Counsel for Matulis also called Dean Dawson, a real estate appraiser, who was recognized as an expert witness without objection from Mutual. On direct examination, Mr. Dawson testified that he had performed an appraisal of the Lake Wylie property Matulis previously owned, and that as of July 2, 2022, it was worth $600,000. Counsel for Matulis then asked Mr. Dawson if he could opine on the value of the property at the time of trial. Counsel for Mutual objected, arguing that such an opinion was an undisclosed supplemental expert opinion. The circuit court overruled the objection, and Mr. Dawson testified that the property was worth $700,000 at the time of trial. No evidence was presented concerning the value of the property when it was sold. At the close of Matulis' evidence, Mutual moved for judgment as a matter of law, which the circuit court denied.

Mutual only called one witness at trial, Tamara Huffman. Ms. Huffman testified that when the lawsuits were initially filed against Matulis, she had been the executive vice president to the operating officer at Mutual. She also testified about the history of Mutual, including how it had been created as a physician-owned mutual insurance company in 2004 due to the high medical malpractice insurance premiums West

Virginia physicians were charged by other companies. On cross-examination, counsel for Matulis questioned Ms. Huffman about Mutual's acquisition by the much larger MagMutual and asked about MagMutual's size and assets. Counsel for Mutual objected to these questions, but the circuit court overruled the objections. After the close of evidence, Counsel for Mutual renewed its motion for judgment as a matter of law, and the circuit court denied the renewed motion.

On the morning of May 16, 2023, the second day of trial, the jury announced its verdict. The jury awarded Matulis $200,000 in damages for net economic loss related to the sale of his lakefront property and $150,000 for annoyance and inconvenience. The jury also decided that Matulis should be awarded prejudgment interest. On June 6, 2023, the circuit court entered a partial judgment order reflecting these verdicts.

On June 14, 2023, Matulis filed a motion for attorney fees incurred in the declaratory judgment action, pursuant to Syllabus Point 2, *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 342 S.E.2d 156 (1986). Matulis requested $523,138.19, consisting of a base fee of $392,907.00 and an upward adjustment of 20% based on the *Pitrolo* factors. Mutual filed a response in opposition on June 30, 2023, arguing that the total amount of attorney fees sought by the motion improperly included attorney fees incurred in matters other than Matulis' effort to vindicate his right to coverage under the policy. Matulis filed a reply in support of his motion on July 7, 2023.

On June 21, 2023, Mutual filed a renewed motion for judgment as a matter of law, or in the alternative, for a new trial. Mutual sought judgment as a matter of law finding that it had no duty to defend Matulis. Mutual also argued that Matulis had failed to set forth any evidence that Mutual's coverage decision had proximately caused any net economic loss or inconvenience. With respect to the motion for new trial, Mutual claimed that a new trial was warranted due to cumulative errors at trial, including the circuit court's preclusion of any evidence related to Matulis' sexual misconduct, any evidence related to the other legal and administrative proceedings he was subject to at the time Mutual denied a defense, and the payment of attorney fees subsequent to the sale of the lakefront property. Mutual also argued that the circuit court's decision to allow Matulis' counsel to cross-examine Ms. Huffman on MagMutual's net worth contributed to this cumulative error. The circuit court entered an order denying this motion on August 18, 2023.

On August 15, 2023, the circuit court entered its memorandum opinion and order reflecting its ruling announced prior to the start of trial that Matulis' motion for summary judgment was granted as to the remaining contested $129,423.65 in breach of contract damages. The circuit court also ruled that Matulis was entitled to $226,223.35 in prejudgment interest: $148,640.02 on the breach of contract damages and $77,583.33 on the $200,000 in economic loss damages. The circuit court explained that it calculated the prejudgment interest on both figures pursuant to West Virginia Code § 56-6-31 (2018).[5]

_____

[5] W. Va. Code § 56-6-31 (2018) states in pertinent part that:

12

On September 1, 2023, the circuit court entered its Order Awarding Attorneys' Fees Under *Hayseeds*, Dismissing Remaining Claims and Final Judgment Order. In this order, the circuit court granted Matulis' motion and granted the requested $523,138.19 in fees. Pursuant to the agreement of the parties, the court also dismissed Matulis' remaining claims, including his bad faith claim.[6] The circuit court then entered

> (b) *Prejudgment* -- In any judgment or decree that contains special damages, as defined below, or for liquidated damages, the court may award prejudgment interest on all or some of the amount of the special or liquidated damages, as calculated after the amount of any settlements. Any such amounts of special or liquidated damages shall bear simple, not compounding, interest. Special damages include lost wages and income, medical expenses, damages to tangible personal property and similar out-of-pocket expenditures, as determined by the court. …
>
> (1) Notwithstanding the provisions of section five, article six, chapter forty-seven of this code, the rate of prejudgment interest is two percentage points above the Fifth Federal Reserve District secondary discount rate in effect on January 2, of the year in which the right to bring the action has accrued, as determined by the court and that established rate shall remain constant from that date until the date of the judgment or decree, notwithstanding changes in the federal reserve district discount rate in effect in subsequent years prior to the date of the judgment or decree: *Provided*, That the rate of the prejudgment interest may not exceed nine percent per annum or be less than four percent per annum. … Once the rate of prejudgment interest is established as provided in this section, that established rate shall remain constant for the prejudgment interest for that particular judgment or decree, notwithstanding changes in the Federal Reserve District discount rate in effect in subsequent years.

[6] The circuit court had previously bifurcated these claims from the breach of contract and *Hayseeds* claims.

final judgment in the amount of $1,465,885.99 in favor of Matulis. Mutual appeals from this final order.[7]

## II.    STANDARDS OF REVIEW

### A. Insurance Coverage

The circuit court's decision regarding Mutual's duty to defend under the Policy is reviewed de novo on appeal. *See* Syl. Pt. 2, *Riffe v. Home Finders Assocs., Inc.*, 205 W. Va. 216, 517 S.E.2d 313 (1999) ("The interpretation of an insurance contract . . . is a legal determination that . . . shall be reviewed de novo on appeal."); Syl. Pt. 1, *Tennant v. Smallwood*, 211 W. Va. 703, 568 S.E.2d 10 (2002) ("Determination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law."). The Supreme Court of Appeals of West Virginia ("SCAWV") regularly has applied the de novo standard of review when reviewing declaratory judgment actions regarding insurance coverage. *See Blankenship v. City of Charleston*, 223 W. Va. 822, 824-25, 679 S.E.2d 654, 656-57 (2009) ("[B]ecause the purpose of a declaratory judgment action is to resolve legal

---

[7] As noted above, Mutual also raises assignments of error related to various orders entered earlier in the case. These orders are appealable through the September 1, 2023, final order. *See* Syl. Pt. 6, *Riffe v. Armstrong*, 197 W. Va. 626, 477 S.E.2d 535 (1996) (quoting Syl. Pt. 5, *State ex rel. Davis v. Iman Mining Co.*, 144 W. Va. 46, 106 S.E.2d 97 (1958)) ("Where an appeal is properly obtained from an appealable decree either final or interlocutory, such appeal will bring with it for review all preceding non-appealable decrees or orders, from which have arisen any of the errors complained of in the decree appealed from, no matter how long they may have been rendered before the appeal was taken.").

questions, a circuit court's ultimate resolution in a declaratory judgment action is reviewed de novo.").

## B. Summary Judgment

The circuit court's summary judgment decisions are likewise reviewed de novo on appeal. *See* Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins.*, 213 W. Va. 80, 576 S.E.2d 807 (2002) (denial review de novo); Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994) (entry reviewed de novo). "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins.*, 148 W. Va. 160, 133 S.E.2d 770 (1963); *see also* W. Va. R. Civ. P. 56.

## C. Evidentiary Issues

The circuit court's evidentiary rulings are reviewed for abuse of discretion on appeal. "Rulings on motions in limine lie within the trial court's discretion." *State v. Dillon*, 191 W. Va. 648, 662, 447 S.E.2d 583, 597 (1994). Likewise, "[t]he West Virginia Rules of Evidence . . . allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court." *Reynolds v. City Hosp., Inc.*, 207 W. Va. 101, 108-09, 529 S.E.2d 341, 348-49 (2000). The appellate court inquires "as to whether the trial court acted

15

in a way that was so arbitrary and irrational that it can be said to have abused its discretion." *State v. McGinnis*, 193 W. Va. 147, 159, 455 S.E.2d 516, 528 (1994).

## D. Post-trial Motions

The circuit court's decision regarding Mutual's renewed motion for judgment as a matter of law is reviewed de novo on appeal. Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). When this Court "reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial . . . its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below." *Id.* at Syl. Pt. 2. Therefore, "when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party." *Id.*

The circuit court's decision regarding Mutual's motion for a new trial is reviewed on appeal for abuse of discretion. *See* Syl. Pt. 3, in part, *In re State Pub. Bldg. Asbestos Litig.*, 193 W. Va. 119, 454 S.E.2d 413 (1994) ("A trial judge's decision to award a new trial is not subject to appellate review unless the trial judge abuses his or her discretion."). Appellate courts apply a "two-pronged deferential standard of review" when reviewing challenges to findings and rulings made by a circuit court. *Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 104, 459 S.E.2d 374, 381 (1995). This Court must "review the rulings of the circuit court concerning a new trial and its conclusion as to

16

the existence of reversible error under an abuse of discretion standard," and "review the circuit court's underlying factual findings under a clearly erroneous standard." *Id.*

## III. DISCUSSION

### A. Duty to Defend

In its first assignment of error, Mutual contends that the circuit court erred in its May 4, 2021, order by granting Matulis' motion for partial summary judgment on the duty to defend; specifically, in finding that Mutual had a duty to defend Matulis in the thirteen lawsuits and notice of claim by former patients, as well as the administrative proceedings concerning his license and hospital privileges. We agree as to certain matters but disagree as to others.

Our analysis of Mutual's alleged duty to defend is guided by well-established principles articulated by the SCAWV. "An insurance company has a duty to defend an action against its insured if the claim stated in the underlying complaint could, without amendment, impose liability for risks the policy covers." *Bowyer v. Hi-Lad, Inc.*, 216 W. Va. 634, 651, 609 S.E.2d 895, 912 (2004). "[I]ncluded in the consideration of whether [an] insurer has a duty to defend is whether the allegations in the complaint . . . are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance polic[y]." Syl. Pt. 5, *W. Va. Fire & Cas. Co. v. Stanley*, 216 W. Va. 40, 602 S.E.2d 483 (2004) (quoting Syl. Pt. 3, in part, *Bruceton Bank v. U.S. Fid. and Guar. Ins.*, 199 W. Va. 548, 486 S.E.2d 19 (1997)). When a complaint presents multiple claims against an insured,

17

if any the claims fall within the scope of coverage, "the insurer must defend all of the claims, although it might eventually be required to pay only some of the claims." *Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 378, 376 S.E.2d 581, 584 (1988).

"Any question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations." Syl. Pt. 5, *Tackett v. American Motorists Ins. Co.,* 213 W. Va. 524, 584 S.E.2d 158 (2003). "When a complaint is filed against an insured, an insurer must look beyond the bare allegations contained in the third party's pleadings and conduct a reasonable inquiry into the facts in order to ascertain whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide." Syl. Pt., *Farmers & Mechanics Mut. Fire Ins. Co. of WV v. Hutzler*, 191 W. Va. 559, 447 S.E.2d 22 (1994). Finally, "it is generally recognized that the duty to defend an insured may be broader than the obligation to pay under a particular policy." *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 194, 342 S.E.2d 156, 160 (1986).

Mutual offers four reasons why it had no duty to defend Matulis in the underlying tort lawsuits: 1) the claims alleged are barred by the Policy's intentional tort exclusion; 2) the claims are barred by the Policy's sexual acts exclusion; 3) the claims are barred by the Policy's criminal acts exclusion; and 4) Matulis' alleged actions that form the basis of the claims do not satisfy the Policy's definitions of "medical incidents" or

"professional services." Although Mutual relies principally on the intentional acts exclusion, we will address each of these arguments.

Both parties and the circuit court have assumed that either all the complaints were viable or none of them were. We disagree. Based on our analysis, we conclude that eight complaints did not allege negligence claims which could survive a motion to dismiss, while the remaining five complaints and the stand-alone notice of claim did. Accordingly, for reasons set forth below, the circuit court is affirmed concerning Mutual's duty to defend in cases 18-C-15, 17-C-1579, 18-C-176, 16-C-497, 16-C-1723, and L.B.'s notice of claim, and reversed as to cases 17-C-1057, 18-C-575, 18-C-578, 18-C-576, 16-C-1709, 16-C-1738, 18-C-985, and 18-C-205.[8]

---

[8] In affirming coverage for some of the lawsuits brought by Matulis's former patients, we recognize that the conduct alleged, and in one case, proven beyond a reasonable doubt, is troubling. We can only imagine the emotional suffering which many of his former patients may have suffered. But in resolving the issues presented, we must be guided by the law and not by sympathy for the women involved, disapproval of the conduct alleged, or the potential financial impact on Matulis of our decision. Nor is it our job to punish the insured, who has already experienced some measure of punishment for his actions, including not just a criminal conviction resulting in his incarceration, but the loss of his medical license and hospital privileges, and having to register as a sexual offender. Our task is simply to determine whether Mutual owed him a defense of medical malpractice (not sexual abuse) claims pursuant to a policy of professional insurance he faithfully paid premiums on over a period of several years, and whether he was treated fairly in the circuit court.

19

## 1. Intentional Tort Exclusion

As set forth above, the Policy provides that Mutual would not defend or pay for "any claim or suit arising out of an intentional tort, dishonest, reckless or malicious act, or breach of contract except as otherwise provided in this policy." In arguing that this exclusion precludes coverage in this matter, Mutual relies on the SCAWV's holding in *Leeber*:

> There is neither a duty to defend an insured in an action for, nor a duty to pay for, damages allegedly caused by the sexual misconduct of an insured, when the liability insurance policy contains a so-called "intentional injury" exclusion. In such a case the intent of an insured to cause some injury will be inferred as a matter of law.

Syl. Pt., *Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 376 S.E.2d 581 (1988). In *Leeber*, the insured was a teacher alleged to have had sexual contacts with a minor student. *See id.* at 376-77, 376 S.E.2d at 582-83. In the underlying complaint the student's parents asserted both intentional acts and negligence stemming from the alleged sexual misconduct, and the insurer filed a declaratory judgment action seeking a declaration that it had no duty to defend or indemnify the insured. *Id.* The *Leeber* Court found no duty to defend, rejecting the insured's argument that the allegations of negligence in the complaint triggered such a duty, explaining:

> the allegations of "negligence" in the complaint are "a transparent attempt to trigger insurance coverage by characterizing allegations of [intentional] tortious conduct under the guise of 'negligent' activity. Our review of the complaint reveals that [the plaintiff in the underlying action] seeks recovery for the alleged intentional acts committed by

20

[the insured]. Thus, there was no duty [upon the homeowner's insurer] to defend[.]".

*Id.* at 381, 376 S.E.2d at 587 (quoting *Linebaugh v. Berdish,* 144 Mich. App. 750, 763, 376 N.W.2d 400, 406 (1985)).

In *Smith v. Animal Urgent Care, Inc.*, the SCAWV relied on *Leeber* and held that "[t]he inclusion of negligence-type allegations in a complaint that is at its essence a sexual harassment claim will not prevent the operation of an 'intentional acts' exclusion contained in an insurance liability policy which is defined as excluding 'bodily injury' 'expected or intended from the standpoint of the insured.'" Syl. Pt. 4, *Smith v. Animal Urgent Care, Inc.*, 208 W. Va. 664, 542 S.E.2d 827 (2000); *see also* Syl. Pt. 10, *W. Va. Fire & Cas. Co. v. Stanley*, 216 W. Va. 40, 602 S.E.2d 483 (2004) (relying on *Leeber* and *Smith* and affirming circuit court's decision that insurer had no duty to defend insured where allegations included both intentional torts and negligence based on sexual misconduct).

Relying on *Leeber* and its progeny, Mutual argues that the underlying complaints against Matulis stem from the allegation that he intentionally touched them in a sexual manner during operations. Accordingly, Mutual argues that it is irrelevant that most of the complaints also include allegations of negligence, medical malpractice, or lack of informed consent. Mutual argues that these negligence-based allegations are insufficient to escape the intentional tort exclusion.

In rejecting Mutual's similar challenge below, the circuit court found that *Leeber* did not control. The circuit court distinguished the underlying complaints from the complaint in *Leeber*, noting that the plaintiffs had alleged "recognized tort theories which, if proven, would fall squarely within the scope of coverage." The circuit court also relied on Matulis' proffered defense that he sometimes performed DVEs on patients when medically indicated. The circuit court determined that it was proper to consider Matulis' defense under the SCAWV's holding that "an insurer must look beyond the bare allegations contained in the third party's pleadings and conduct a reasonable inquiry into the facts in order to ascertain whether the claims asserted may come within the scope of the coverage." Syl., in part, *Farmers & Mechanics Mut. Fire Ins. Co. of W. Va. v. Hutzler*, 191 W. Va. 559, 447 S.E.2d 22 (1994). The circuit court also quoted the single syllabus point of *Columbia Cas. Co. v. Westfield Ins. Co.*, 217 W. Va. 250, 617 S.E.2d 797 (2005) in explaining "that Dr. Matulis' perspective is entitled to 'primary consideration, relevance, and weight' in determining whether the complaints allege intentional misconduct."

In determining whether Matulis has asserted valid claims for negligent conduct, we must consider our law concerning the ability to plead inconsistent facts and theories in the same pleading. Under Rule 8 of the West Virginia Rules of Civil Procedure, parties may plead inconsistent claims in the alternative.[9] For example, a plaintiff may plead

---

[9] Rule 8(e)(2) provides in pertinent part that:

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or

22

an intentional tort in one count and a negligence claim in another. *See, e.g., Terra Nova Ins. Co. Ltd. v. 900 Bar, Inc.*, 887 F.2d 1213, 1225-226 (3d Cir. 1989) (complaint alleging both intentional and negligent shooting); *Doe v. Fournier*, 851 F.Supp.2d 207, 226 n. 11 (D. Mass. 2012) (complaint may allege both negligent infliction of emotional distress and intentional infliction of emotional distress); *Gulf Ins. Co. v. Dooley,* 286 F.Supp. 16, 17 (N.D. Ill. 1968) (applying Illinois law) (duty to defend under homeowner's policy where complaint contained one count alleging willful and wanton misconduct but another count alleged negligence on the part of the homeowner); *Iacobelli Const. Co., Inc. v. Western Cas. & Sur. Co.*, 343 N.W.2d 517, 522 (Mich. Ct. App. 1983) (finding duty to defend where complaint alleged both deliberate and unintentional trespass); *Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210 (Utah 2006) (insurer was required to defend lawsuits alleging sexual assault and negligent infliction of emotional distress in the alternative); *cf. Arnold Agency v. W. Va. Lottery Comm'n*, 206 W. Va. 583, 596, 526 S.E.2d 814, 827 (1999) (recognizing that a plaintiff could plead both breach of contract and fraud in the same complaint).

Given that complaints are filed before the parties have conducted any discovery, it will often be desirable to plead claims in both negligence and intentional tort. *See* A. Benjamin, 5 Federal Practice and Procedure (Wright & Miller) § 1283 Westlaw (4th

---

defense or in separate counts or defenses…. A party may also state as many separate claims or defenses as the party has regardless of consistency….

ed. database updated June 2024) ("frequently a party, after a reasonable inquiry and for proper purposes, must assert contradictory statements when he or she legitimately is in doubt about the factual background of the case or the legal bases that underlie affirmative recovery or defense.") (footnote omitted). As one court has observed, Rule 8 "permits alternative pleading, and any careful civil lawyer would include a negligence claim as well as one for an intentional tort, in order to protect his client against development at trial of the evidence along a line different from the facts as related to him by his client." *State v. Dodge*, 397 A.2d 588, 591 (Me. 1979).

A factual assertion regarding one claim will not be treated as an admission contradicting an alternative or inconsistent claim in another part of the same complaint. Syl. Pt. 10, *Arnold Agency v. Va. Lottery Comm's, supra*. If it were otherwise, the portions of Rule 8 allowing parties to plead alternative and inconsistent claims would be a nullity, defeating the salutary purposes of that rule. *Id.* at 595, 526 S.E.2d at 826.

A party need not expressly allege that it is pleading claims in the alternative. *See Coleman v. Standard Life Ins. Co.*, 288 F.Supp.2d 1116, 1120 (E.D. Cal. 2003) (plaintiff does not need to use particular words "plead in alternative"); *Arnold & Assocs., Inc. v. Misys Healthcare Systems PLC*, 275 F.Supp.2d 1013, 1029 (D. Ariz. 2003) (no need to use "magic words" of "in the alternative"). No particular language is required; even under the most conservative reading of Rule 8, it is sufficient if a party uses language from which one can reasonably infer that the party was pleading in the alternative. *Holman v.*

24

*Indiana*, 211 F.3d 399, 407 (7th Cir. 2000); *Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp. of DC*, No. 11-61577-CIV, 2011 WL 3843931, at *3 (S.D. Fla. Aug. 26, 2011); *G-I Holdings, Inc. v. Baron & Budd*, 238 F.Supp.2d 521, 536 (S.D. N.Y. 2002). If two counts allege claims based on mutually exclusive theories, they should be read as stating claims in the alternative. *See Joe Hand Promotions, Inc. v. Lynch*, 822 F.Supp.2d 803, 805 (N.D. Ill. 2011) (court concluded that a complaint evidenced "a sufficient intent to plead in the alternative" despite the absence of express language to that effect because any complaint asserting that a single action violates two mutually exclusive statutes can only be interpreted as alleging alternative claims.); *J&J Sports Prods., Inc. v. Premium Lounge, Inc.*, No. 4:13CV1749 TIA, 2014 WL 2711852, at *3 (E.D. Mo. June 16, 2014) (same). Having recognized the general rule allowing alternative and inconsistent pleadings, however, we must recognize there are some factual situations which can be reasonably characterized in only one way.

For example, when a teacher pleads guilty to sexually abusing a junior high school student, a plaintiff cannot avoid policy exclusions for intentional conduct, sexual conduct, or criminal conduct by describing the teacher's actions as "negligent." *See Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 376 S.E.2d 581 (1988). The SCAWV has made it abundantly clear that it will not countenance "transparent" attempts to create coverage where none exists. *See id.* at 381, 376 S.E.2d at 587. Similarly, when a person repeatedly rapes his young niece, both vaginally and anally, over a period of several years, while she is screaming, crying, and kicking, a plaintiff cannot avoid the usual policy exclusions by

25

describing the defendant's actions as "negligent." *See W.Va. Fire & Cas. Co. v. Stanley*, 216 W. Va. 40, 602 S.E.2d 483 (2004). As Justice Starcher observed in his concurring opinion in *West Virginia Fire & Casualty Company v. Stanley*, when referring to *Leeber* and *West Virginia Fire & Casualty Company*, "[t]here is no way on God's green earth that either of these tortfeasors should have been permitted to shift the cost of their conduct onto an insurance company." *Id.* at 55, 602 S.E.2d at 498.[10]

Similarly, in the context of health care, there is conduct which cannot be described as acting "negligently." *See St. Paul Fire and Marine Ins. Co. v. Engelmann*, 639 N.W.2d 192, 198 (S.D. 2002) (doctor inserted his penis in a patient's vagina during a gynecological examination); *Rivera v. Nevada Med. Liab. Ins. Co.*, 814 P.2d 71 (Nev. 1991) (sodomy during breast, vaginal and rectal examination); *Physicians Ins. Co. v. Pistone*, 726 A.2d 339 (Pa. 1999) (physician exposed himself, fondled patient, and masturbated in front of her). But other conduct by health care professionals may be either permissible or inappropriate depending on whether the action is taken for medical purposes or for purposes of sexual gratification. It is not unusual for doctors and nurses to insert their fingers or instruments into mouths, vaginas, or anuses of patients to diagnose or treat

---

[10] *Smith v. Animal Urgent Care, Inc.*, 208 W. Va. 664, 542 S.E.2d 827 (2000), another case cited by Mutual, also involves claims that were in "essence" for sexual misconduct with some "negligence-type allegations" that were insufficient to trigger a duty to defend or indemnify. In *Smith*, the plaintiff alleged that the veterinarian she worked with "engaged in various acts for the purpose of harassing, degrading, and embarrassing her through unwelcome sexual advances and exploitation. According to Ms. Smith, these acts included both verbal and physical conduct of a sexual nature." *Id.* at 665, 542 S.E.2d at 828.

medical conditions, but such conduct would be unacceptable in other contexts, at least where consenting sexual partners are not involved. *See Am. Cas. Co. v. Corum,* 910 P.2d 1151, 1154 (Or. Ct. App. 1996) (noting that "[t]he [digital] probing of a vagina by a registered nurse in a hospital setting" could be either "the rendering of professional services" or "criminal sexual abuse" depending on the circumstances).[11] Likewise, as the court observed in *Illinois State Medical Ins. Servs., Inc. v. Cichon,* 629 N.E.2d 822, 827 (Ill. Ct. App. 1994), it is usually a crime when someone thrusts a knife into someone, but surgeons routinely cut their patients with scalpels.[12]

In this case, where the insured was convicted of sexual abuse for fondling T.W.'s breasts, and Matulis has never offered any evidence or argument that breast examinations are appropriate during colonoscopies and similar procedures, and two experts

---

[11] In *Gray v. Mena*, 218 W. Va. 564, 625 S.E.2d 326 (2005), the SCAWV recognized that a DVE could be either a tortious act or the provision of medical care depending on why it was performed. In that case, the plaintiff sought to avoid the requirements of the MPLA by filing a complaint which alleged only civil battery and assault. In upholding a dismissal (albeit without prejudice), the court observed that the physician would undoubtedly argue at trial that his actions were medically required for diagnosis and treatment, and warned litigants that such cases were "exceedingly fact-driven," and that litigants should be diligent in meeting the requirements of the MPLA "where the healthcare provider's action could possibly be construed as having occurred within the context of the rendering of health care services." *Id*. at 570, 625 S.E.2d at 332.

[12] Given that physicians and nurses, especially OBGYNS, gastroenterologists, urologists, and proctologists, routinely exam and manipulate intimate areas of their patients, it is hard to imagine how healthcare providers could enjoy the benefits of medical malpractice insurance if their carriers could deny a defense whenever a patient alleged in a complaint that he or she had been touched without their knowledge or consent, or in a way which the patient deemed inappropriate.

27

have opined that breast examinations would be inappropriate, that conduct cannot be considered merely negligent, and would be covered by the intentional tort exclusion.

In the case of DVEs, however, Matulis informed Mutual, when he first notified them of pending claims, that he performed limited vaginal examinations when appropriate during colonoscopies and similar procedures. He also provided them with two expert opinions that DVEs were medically appropriate, and sometimes required, by the applicable standard of care. His position was not frivolous, and Mutual was required to provide him with a defense where a complaint pleaded the performance of a DVE as an act of medical malpractice, rather than, or as an alternative to, sexual misconduct. In cases where a plaintiff alleged both a breast examination and a DVE, the duty to defend would exist if the DVE claim was properly pleaded.

## 2. Sexual Acts or Activities Exclusion

According to the policy, Mutual "will not defend or pay for… liability arising out of sexual acts or sexual activities whether under the guise of professional services or not, on the part of any insured[.]" Because the policy does not define either "sexual acts" or "sexual activities," we must consider the ordinary and usual meaning of these words, keeping in mind that we are dealing with health care providers who routinely touch patients in intimate areas. *See* W. Va. Code § 61-8B-1(5) (2024) ("'Sexual contact'" means any intentional touching, either directly or through clothing, of the breasts, buttocks, anus, or any part of the sex organs of another person, or intentional touching of any part of another

28

person's body by the actor's sex organs **and the touching is done for the purpose of gratifying the sexual desire of either party**") (emphasis added); *Illinois State Med. Ins. Servs., Inc. v. Cichon*, 629 N.E.2d 822, 826 (Ill. Ct. App. 1994) ("Routine physical examinations of female patients often involve such actions [rectal exams, rubbing and application of creams and lotions to breasts and rectal and vaginal areas, invasive manipulations, and digital penetrations] by a physician [but] are not sexual conduct as a matter of law.").

Consequently, we conclude that Matulis' actions in performing DVEs were not sexual acts or activities unless they were performed to satisfy his sexual urges rather than any medical purpose. As noted above, some of the complaints allege in the alternative causes of action which are not based on the performance of sexual acts or sexual misconduct. If a complaint alleges both sexual misconduct and medical malpractice, there will be a duty to defend unless the conduct is essentially sexual in nature and the allegation of negligence is mere window dressing. *See generally St. Paul Fire and Marine Ins. Co. v. Engelmann*, 639 N.W.2d 192 (S.D. 2002) (insurer was required to defend lawsuit where claim based on negligent performance of gynecological exams using improper positions, procedures, and methods was covered but not claim of raping patients); *Chung v. Physicians Reciprocal Ins*., 635 N.Y.S.2d 386, 387 (Ct. App. 1995) (insurer was required to defend where complaint was not cast solely within sexual acts exclusion and reasonably could be read as alleging negligent professional treatment).

### 3. Criminal Acts Exclusion

The policy provides that Mutual "will not defend or pay for…injury or damage resulting from … a willful violation of a statute, ordinance or regulation imposing criminal penalties." Here, Matulis was criminally convicted for the sexual assault of T.W. related to his fondling of her breasts and that conviction was upheld on appeal. *See State v. Matulis*, No. 18-1053, 2020 WL 1487810, at \*6 (W. Va. Mar. 23, 2020) (memorandum decision). At no point has Matulis offered any medical justification for doing breast examinations during colonoscopies or similar procedures. Even his own expert witnesses failed to offer any justification for doing breast examinations during colonoscopies or other procedures. Nor have any of his former patients alleged that there was any medical reason (mistaken or otherwise) for Matulis to conduct breast examinations. Therefore, we conclude that Mutual had no duty to defend or indemnify any claims related solely to breast "examinations" of T.W. or any other patients.

As noted above some actions cannot be characterized as anything but criminal conduct, but DVEs are not criminal per se.[13] Physicians routinely insert their fingers in the vaginas of female patients or otherwise manipulate the genitals of female patients in health care settings. These actions are not criminal unless they are performed for purposes of sexual gratification, rather than any medical reason, mistaken or otherwise. In this case, there was expert testimony that DVEs during colonoscopies are permitted, if

---

[13] We note in this regard that Matulis was acquitted on all counts related to DVEs during his criminal case.

not required, by the applicable standards of care under at least some circumstances. Under Rule 8, plaintiffs could assert in one count that their DVEs were done for sexual gratification, and in another count that their DVEs were performed tortiously but not criminally. In that situation, the first count would allege a criminal act which was not covered by the policy, while the second count would allege a malpractice claim which would be covered.

### 4. Medical Incidents/Professional Services

The Policy provides that Mutual "will pay those sums that the insured becomes legally obligated to pay as damages because of a claim that is a result of a medical incident." The Policy defines a medical incident as "any act, series of acts, failure to act, or series of failures to act arising out of the rendering of, or failure to render, professional services, to any one person by an insured." Professional services, in turn, are defined as "the providing of medical services, including medical treatment, which the insured is licensed to perform." Thus, for the underlying claims to fall within the Insuring Agreement of the Policy, the damages would have to be the result of an act or failure to act in rendering medical services or treatment which Matulis is licensed to perform. Sexual misconduct would not fall under the rubric of medical services or treatment. Many of the complaints, however, allege in the alternative that Matulis was negligent in providing medical care. Mutual was required to provide a defense in those cases where alternative claims for medical malpractice were adequately pleaded.

### 5. Analysis of Complaints

Having laid the groundwork for our analysis, we turn to the complaints and notice of claim at issue. As more fully set forth below, we agree with Mutual that it was not required to defend claims of sexual abuse, criminal acts, or intentional misconduct under its policy with Matulis. But it was required to defend plausible claims of medical malpractice. By plausible, we simply mean that a claim of professional negligence has been expressly stated, is supported by law, and is based on conduct which can be reasonably characterized as having a non-frivolous medical basis. A claim of professional negligence is not plausible when sexual misconduct is the "essence" of the complaint and words such as "negligence" are inserted merely in a "transparent" attempt to create coverage.

#### a. Cases Where the Complaints Triggered a Duty to Defend

**B.D. v. Matulis, Civil Action No. 18-C-15**

This complaint expressly states that it involves alternative and inconsistent pleadings. Its Introduction states in pertinent part:

> This cause of action arises as a result of the negligence and wrongful conduct of numerous persons and entities…. While the conduct of the Defendants alleged herein is egregious, it is yet to be determined as to whether the acts of the Defendants are negligent, intentional, medically related and/or criminal. Therefore, the causes of action set forth herein are pled together and in the alternative.

Paragraph 33 of the complaint alleges that "Matulis placed his fingers in and about the Plaintiff's vaginal area without the knowledge or consent of the Plaintiff" while

32

she was under anesthesia. There is no allegation that he touched or examined her breasts. As noted above, although claims related to breast examinations would not be covered by Mutual's policy, there would be a duty to defend claims related to DVEs if they were properly pleaded.

The complaint contains several counts, some of which involve intentional misconduct, while others are based on negligence. The Fourth Cause of Action alleges that the defendants **negligently** inflicted emotional distress. The Eleventh Cause of Action, which is most pertinent to our analysis, asserts a claim for violation of the MPLA (Medical Professional Liability Act). Among other things, it alleges that:

> 78. Defendant Matulis … had a duty to undertake the colonoscopy performed on the Plaintiff in a non-negligent and reasonably prudent manner as would a reasonably prudent gastroenterologist acting under the same or similar circumstances.
> 79. Defendant Matulis… breached said standard of care by (a) failing to obtain consent from the Plaintiff prior to placing his fingers in or about her vaginal area; (b) placing his fingers in or about the Plaintiff's vaginal area without having proper training, expertise or specialty in gynecology, (c) engaging in the practice of gynecology without proper licensing, credentialing or privileges; (d) failing to properly note all actions taken by Defendant during the procedure, and (e) failing to advise the Plaintiff, after the procedure, of his conduct.
> 80. As a direct and proximate result of Defendant Matulis['s] breach of the standard of care expected of reasonably prudent gastroenterologists…, the Plaintiff has incurred damages….

These allegations clearly state a claim for professional negligence rather than a claim for sexual misconduct, criminal acts, or intentional tort. The action alleged is not

inherently sexual in nature because physicians routinely conduct DVEs. Thus, the complaint is not "essentially" one for sexual misconduct with a thinly veiled attempt to create coverage by merely inserting the word "negligent." Furthermore, claims that a physician negligently performed a medical procedure are precisely the sort of risk for which professional malpractice policies are purchased, and the defense of such claims is within the reasonable expectations of the insured.

## **A.H. and Fleming v. Matulis, Civil Action No. 18-C-176 (Class Action) (amended complaint)**

Class Representative A. H. underwent a colonoscopy, sigmoidoscopy, and gastroscopy. Class representative Adriana Fleming underwent a colonoscopy. According to the complaint, the members of the class may have been subjected to non-consensual touching of their breasts or genitalia. As noted above, Mutual was not required to defend claims related to nonconsensual ogling or fondling of breasts.

The first paragraph of the A.H. complaint alleges that:

1. The litigation concerns the Defendants' failure to obtain consent from Plaintiffs, … during and following colonoscopies, sigmoidoscopies and vaginal and/or breast examinations and improper and wrongful non-consensual touching and the failure to document the consent in their medical charts, … [and] **medical negligence….** Furthermore, **the Defendants' failure to obtain consent in order to perform a vaginal and/or breast examination, failure to document consent for a breast and/or vaginal examination in the medical**

34

> **records…and medical negligence of defendants violate**
> **the Medical Professional Liability Act….**

(Emphasis added).

The Background Facts section of the complaint also contains allegations of professional negligence, stating that Matulis had a duty to obtain informed consent, that he had a duty to "perform his services in a manner and according to standards of a reasonably prudent" gastroenterologist, that he had a duty to inform plaintiffs of any procedures performed without their consent, that he "breached the standard of care of a reasonably prudent gastroenterologist," and that his "acts, conduct and omissions were negligent, careless and wrongful and as a proximate result of [his] negligence," the plaintiffs were injured.

The complaint contains several counts, some of which allege intentional and/or sexual misconduct, while others allege professional misconduct, at least in part. Count 1 ("Lack of Informed Consent") alleges, among other things, that Matulis had a duty to "act in a reasonable and prudent manner and to obtain consent from" the Plaintiffs "before performing a breast and/or vaginal examination," see Paragraph 57, and that he negligently breached his duties to them. See Paragraph 60.

Similarly, Count II ("Medical Negligence") contains allegations of both negligent and malicious, conscious, reckless, and outrageous conduct, including

allegations of medical negligence. See Paragraph 63 ("[Matulis] owed a duty… to Plaintiffs to exercise that degree of care, skill and learning required or expected of a reasonable, prudent healthcare provider in [his] profession or class") and Paragraph 64 (Matulis "failed to meet the applicable standards of care and violated this duty of care through various negligent acts including failing to obtain consent from plaintiffs… to perform vaginal and/or breast examinations and failing to document the consent in their medical charts."). This complaint clearly alleged professional malpractice and sexual misconduct in the alternative, and Mutual had a duty to defend the claims of professional negligence.

**Jane Doe I and Jane Doe 2, Civil Action No. 16-C-1723 (Class Action) (second amended complaint)**

Matulis performed a colonoscopy on Jane Doe 1. He performed a colonoscopy and gastroscopy on Jane Doe 2. All these procedures were performed under anesthesia. Both class representatives are concerned that they may have been subjected to touching or observation of their breasts or genitalia, without their knowledge or consent, while they were unconscious. Likewise, other members of the class may have been subjected to breast or vaginal procedures without their knowledge or consent.

The Factual Allegations section of the complaint contains statements of both professional negligence and intentional and/or sexual misconduct. Specifically, pertaining to negligence, the complaint states that Matulis was negligent and fell below the standard of care by performing vaginal and/or breast examinations without consent and without

documenting that consent in the medical records, that he fell below the standard of care by failing to inform plaintiffs of any procedures that were performed without their consent, and that his "acts, conduct and omissions were negligent, careless and wrongful," and that his negligence proximately resulted in injury to Plaintiffs. See Paragraphs 9, 10, 26 and 36.

The complaint contains several counts, some of which allege professional misconduct, while others present claims of sexual misconduct. Count I (Lack of Informed Consent) alleges in part that Matulis owed duties to the Plaintiffs "to act in a reasonable and prudent manner and to obtain consent from them before performing breast and/or vaginal examination[s]," that he failed to obtain consent, and that he negligently breached his duties to the Plaintiffs, thereby proximately injuring them. See Paragraphs 41, 42 and 44. Count II ("Medical Negligence") contains similar allegations of professional negligence, and also alleges that his negligent acts included a failure to document any consent in the medical charts. See Paragraphs 46 and 47.

**R.K. v. Matulis, Civil Action No. 17-C-1579**

In the R.K. case, Matulis performed a vaginal examination during an evaluation for acute pancreatitis. The facts portion of the complaint alleges both professional negligence and "intentional, willful, wanton, and reckless actions and inactions." Specifically, regarding professional negligence, the factual portion of the complaint states in Paragraph 10 that: "Defendant Matulis fell below the standard of care by performing a vaginal examination that was not medically indicated, failing to obtain

37

informed consent and failing to document the vaginal examination in the medical record…" See also Paragraphs 8 and 9.

The complaint contains four counts, one of which clearly alleges negligence on the part of Matulis. Count 1 (Negligent and Reckless Misconduct) states in Paragraph 17 that: "[Matulis] failed to act in a reasonable and prudent manner and deviated from the applicable standard of care by performing a vaginal examination that was not medically indicated, failing to obtain informed consent and failing to document the vaginal examination in the medical record during the consultation…." Paragraph 19 stated that "[a]s a direct and proximate result of [Matulis'] negligent and reckless misconduct," the Plaintiffs were entitled to damages.

**T.W. v. Matulis, Civil Action No. 16-C-497**

According to this complaint, Matulis placed his hands inside T.W.'s hospital gown and "groped her breasts" and "used his fingers repeatedly to penetrate her vagina" during a colonoscopy when she was anesthetized. As noted above, the breast groping by itself would not trigger a duty to defend, given the circumstances of this case, but the allegations of digital penetration of her vagina could, if properly pleaded. The complaint does not allege sexual acts, activities or misconduct, or describe the plaintiff as a victim of sexual assault. Paragraph 11 of the amended complaint states that: "Defendant Matulis did not obtain informed consent from T.W. prior to touching her breasts and inserting his fingers inside her vagina. Likewise, Defendant Matulis did not document a breast exam or

38

vaginal exam in his operative report or the medical chart." Paragraph 12 alleges that: "Defendant Matulis was **negligent**, reckless and committed a battery upon Plaintiff." (Emphasis added). Paragraph 21 states that plaintiff is entitled to damages because of the Defendants' "**negligent**, willful, wanton, and reckless misconduct." (Emphasis added). Given the liberal pleading requirements of Rule 8, this language was sufficient to trigger a duty to defend.

### L.B. Notice of Claim

L.B. filed a notice of claim, but her claim was settled without filing a lawsuit. Although no complaint was filed, Mutual included this claim in its declaratory judgment action, and the circuit court decided that there was a duty to defend. Although minimal, the certificate of merit alleges that Matulis "breached the applicable standard of care," "negligently fail[ed] to conduct a proper colonoscopy exam," and was "otherwise negligent," in addition to asserting that "Mrs. [B.] was sexually assaulted by Dr. Matulis." These allegations, though minimal, are sufficient to trigger a duty to defend. "[A]n insured's right to a defense will not be foreclosed unless such a result is inescapably necessary." *Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 378, 376 S.E.2d 581, 584 (1988).

**b. Cases Where There Was No Duty to Defend**

**J.L. v. Charleston Gastroenterology Associates, P.L.L.C., Civil Action No. 16-C-1738**

This complaint does not contain any allegations that a DVE was performed. According to Paragraph 20 of the complaint, "[w]ithout her knowledge or consent, and while Plaintiff was under anesthesia and incapacitated, Defendant Matulis placed his hands upon her, upon or inside her hospital gown, and pulled away her hospital gown for the purpose of ogling and/or fondling her breasts." "Dr. Matulis made a comment to agents, servants and employees of Charleston Gastroenterology and/or Day Surgery Center, prior to pulling away her hospital gown, indicating the lascivious and wrongful purpose for removing her hospital gown." Paragraph 21. "There was no legitimate purpose for Defendant Matulis to remove Plaintiff's hospital gown, ogle and/or fondle Plaintiff's breasts before, during or after the course of the esophagogastroduodenoscopy procedure." Paragraph 33.

This complaint is "essentially" for sexual misconduct. In addition to the language quoted above, there are frequent references to the sexual nature of Matulis' misconduct. See Paragraph 2 ("J.L. was a victim of sexual assault"); Paragraph 28 ("At no time did Dr. Matulis or any other defendant healthcare provider advise plaintiff that she had been sexually assaulted while under anesthesia."); Paragraph 29 ("Upon information and belief, Plaintiff was not the first female patient to be sexually assaulted by Dr. Matulis…"); Paragraph 37 ("Defendant Matulis sexually assaulted the Plaintiff while she was incapacitated and under anesthesia without her consent.").

The complaint contains four counts, two pertaining to Matulis and two pertaining to the corporations which employed him. The counts relevant to Matulis are not torts of negligence. Count I is for battery, a tort which, by definition, is intentional. Count II is for the tort of outrage, which requires intentional or reckless conduct, so outrageous as to exceed the bounds of decency. *See* Syl. Pt. 6, *Harless v. First Nat'l Bank in Fairmont*, 169 W. Va. 673, 289 S.E.2d 692 (1982).[14] Although "negligent, reckless, willful, wanton, and intentional misconduct" are alleged in both counts, tossing "negligent" into these counts did not trigger a duty to defend, any more than describing "seduction" as "negligent" in *Leeber* circumvented the policy exclusion for intentional misconduct.

## P.W. v. Charleston Gastroenterology Associates, P.L.L.C., Civil Action No. 17-C-1057

The complaint in this case alleges that Matulis placed his fingers inside the plaintiff's genitalia, with no legitimate reason for doing so, and without her knowledge or consent, while she was anesthetized during a colonoscopy. Once again, this is "essentially" a complaint for intentional sexual misconduct, although there are two passing references to "negligent" conduct. There are counts against Matulis for battery and the tort of outrage, but none for negligence, professional or otherwise. The complaint is replete with references to "sexual assault." See Paragraph 17 ("Upon information, knowledge and belief, the sexual assault was witnessed by one or more agents, servants or employees of Charleston

---

[14] What we have been referring to as the "intentional tort" exclusion in the policy includes "reckless" as well as "intentional" conduct.

Gastroenterology."); Paragraph 21 ("…after the colonoscopy procedure and sexual assault"); Paragraph 23 ("At no time did Dr. Matulis or any other defendant healthcare provider advise Plaintiff that she had been sexually assaulted…"); Paragraph 24 ("Upon information, knowledge and belief, Plaintiff was not the first female patient to be sexually assaulted by Dr. Matulis during a procedure…).

## K. H. v. Matulis, Civil Action No. 16-C-1709

Although the complaint alleges that Matulis deviated from the standard of care, the factual allegations of the complaint concern behavior which would not have triggered a duty to defend. The complaint relates that Matulis performed breast examinations which were not required for the medical condition being treated, and that Matulis made "inappropriate and sexually suggestive, and explicit, remarks and comments to Plaintiff." See Paragraphs 8 and 9. Clearly, the claim based on inappropriate comments to the Plaintiff did not trigger a duty to defend. Nor, as we have discussed above, would the claim based on an unwarranted breast examination trigger such a duty in the context of this litigation where there was no argument or evidence to support breast examinations during colonoscopies and similar procedures.

## R.L., Civil Action No. 18-C-576; T.W. & R.W., Civil Action No. 18-C-578; D.C. & R.C., Civil Action No. 18-C-575

The language of these complaints is basically the same, so they will be discussed together. Although these complaints use negligence language in places, and

contain a count for lack of informed consent, the conduct alleged is clearly sexual misconduct. Even in the counts for lack of informed consent, the plaintiffs characterize Matulis' conduct as "inappropriate and unwelcome sexual conduct." The factual statements of the complaints also contain paragraphs stating that the plaintiffs were "subjected to inappropriate and offensive sexual misconduct by Dr. Matulis, including failing to obtain informed consent from [the plaintiffs] for the inappropriate touching, and failing to document the same in any medical chart." These complaints do not indicate whether the plaintiffs were touched upon their breasts, genitalia, or both.

### Y.T. v. Matulis, Civil Action No. 18-C-985

Although the plaintiff raises a medical negligence claim against Matulis, it is based on an understanding that he had a pattern or practice of sexual assault, and that because of that pattern, her colonoscopy deviated from the standard of care, and its findings were therefore unreliable. Consequently, her allegations do not fall within the purview of a possibly negligent examination; they assume that Matulis did commit sexual misconduct, either against the plaintiff or someone else. Accordingly, they arise from sexual misconduct.

### J.W. v. Matulis, Civil Action No. 18-C-205

The plaintiff alleges that Matulis inserted his hand and/or fingers into her vagina, and "us[ed] a medical device on her in a sexual, non-medical manner," during a colonoscopy. Although the plaintiff raises a medical negligence claim against Matulis, it

43

is based on her understanding that he had a practice of sexual misconduct when performing colonoscopies and that because of this practice, her colonoscopy deviated from the standard of care. Therefore, her allegations do not fall within the purview of a possibly negligent examination; they assume that Matulis did commit sexual misconduct, either against her or others. Accordingly, her allegations arise from sexual conduct.

## B. Damages For Breach of the Duty to Defend

Mutual's second and third assignments of error relate to the circuit court's decision, set forth in its May 12, 2023, and August 15, 2023, orders, to grant Matulis' motion for partial summary judgment on damages for Mutual's breach of contract. As an initial matter, the Court's ruling on the duty to defend issue necessitates that the Court also vacate the circuit court's award of attorney fees incurred in defending the underlying lawsuits as breach of contract damages. As discussed above, Mutual only owed a duty to defend in some of these underlying lawsuits, so the damages resulting from this breach must necessarily be recalculated in light of this Court's ruling. However, because Mutual's assignments of error on the breach of contract damages raise issues which will remain relevant on remand, this Court will address them on the merits.

### 1. Attorney Fees Awarded as Breach of Contract Damages Under the Policy

Mutual does not question that it was required to pay $212,100.80 in attorney fees if it had a duty to defend the underlying tort claims, but it challenges whether the additional $129,423.65 were actually related to the defense of the underlying claims.

44

Specifically, it contends that it should not be responsible for: (1) attorney fees incurred in Matulis' criminal prosecution for sexually abusing his patients; (2) his disputes with Mutual over coverage; (3) disputes with an entirely unrelated insurer regarding coverage; and (4) various matters related to financial asset protection and potential bankruptcy.

Matulis claims that Mutual should have identified which items they contested line by line in his breakdown of the $129,423.65, but Mutual says that it disputed all of them, either because of policy exclusions or because they were not related to the defense of the underlying civil actions by former patients. In general, Matulis contends that all his attorney fees were recoverable because they were somehow for "common defense," a position adopted by the circuit court.

### a. Criminal Prosecution

Mutual argues that its policy with Matulis expressly disclaims responsibility for defending criminal actions. Matulis responds that attorney fees related to his criminal defense should be recoverable under a theory of "common defense" because work done in connection with the criminal actions would be useful in defending the civil actions. For example, many of the entries related to using focus groups to test a defense that would be used in both the criminal and civil cases, *i.e.,* that there were valid medical reasons for doing a DVE during a colonoscopy. Similarly, some of the entries deal with research to locate experts who could testify about sexual gratification and whether the use of latex

gloves during an examination was consistent with touching patients for purposes of sexual gratification. Matulis has cited no legal authority that he should be able to recover attorney fees under a so-called theory of "common defense." Absent some formal agreement between the parties (Matulis and Mutual) about sharing costs in providing the different defenses, there is no basis to automatically impose liability even if there happens to be some collateral benefit. Consequently, we hold that the circuit court erred in awarding attorney fees to Matulis for defending the criminal actions against him.

### b. Disputes with Mutual Over Coverage

The circuit court awarded $129,423.65 in disputed attorney fees as damages for breach of contract to compensate Matulis for attorney fees incurred in defending underlying lawsuits by former patients. After the *Hayseeds* trial, it also awarded attorney fees for work spent litigating Mutual's declaratory judgment action. Mutual appears to argue that there may have been some overlap in these awards of attorney fees, and that the circuit court may have also awarded attorney fees for pursuing bad faith claims against Mutual. Matulis was not entitled to duplicative fees, and the circuit court erred to the extent that it may have awarded duplicative fees.

### c. Disputes with Another Carrier Over Coverage

Matulis seeks to recover attorney fees for work done in a federal declaratory judgment action brought by another insurer against Matulis; his former employer,

Charleston Gastroenterology; and ten of his patients. *See Westfield Ins. Co. v. Matulis*, 421 F.Supp.3d 331, 335 (S.D. W. Va. 2019). The scope of Matulis' participation in this lawsuit was allegedly limited. He did not contest Westfield Insurance Company's position that there was no coverage, but he contends that it was necessary to litigate this action to a limited extent because some of the claimants in the underlying tort actions were seeking to conduct discovery in the *Westfield* coverage action. Among other things, Matulis seeks attorney fees for opposing a motion to compel his testimony in the *Westfield* action. Apparently, he was concerned about avoiding duplicative discovery and possible attempts to circumvent discovery limitations in other actions. We conclude that the circuit court erred in allowing Matulis to recover attorney fees for litigating the *Westfield* case.[15]

### d.  Asset Protection and Bankruptcy

Attorney fees allegedly related to asset protection and bankruptcy seem to account for very little, if any, of the attorney fees claimed. Row 554 on Exhibit One to Matulis Supplemental Memorandum in Support of Cross-Motion for Partial Summary

---

[15] In most cases, requiring an insurer to defend its insured in coverage related declaratory judgment actions brought by another carrier will put the first carrier in an untenable position, because both carriers would probably have similar policy exclusions. For example, in the present case, Mutual had an exclusion for "intentional torts" while Westfield had an exclusion for "expected or intended injury." Mutual could hardly be expected to take inconsistent positions in the two declaratory judgment actions brought by itself and Westfield. Mutual's duty to defend was limited to the underlying actions brought by Matulis's patients and did not extend to declaratory judgment actions brought by other insurers.

Judgment filed February 6, 2023, has an entry pertaining to bankruptcy: 2170 "call from I. Forman re: pending discovery and bankruptcy filing options along with impact of bankruptcy on litigation-0.3 hr." This chart does not seem to have any entries identified as pertaining to asset protection, *i.e.,* the transfer and handling of retirement funds and accounts. It is possible that this category of fees may have been withdrawn. In any event, hours incurred for work on asset protection and bankruptcy would not be related to the defense of the underlying civil actions by patients and would not be recoverable. The circuit court erred to the extent it may have awarded attorney fees for asset protection or bankruptcy research.

### 2. Administrative Defense Fees Awarded Under the Broad Form Endorsement

Matulis' policy does not cover the defense of administrative proceedings, but the Broad Form Administrative Endorsement to the policy does, up to a limit of $25,000.00. In this case, there were two such proceedings, the BOM licensing investigation and the investigation and suspension of privileges by CAMC. Mutual argues that there was no coverage under this endorsement because it was not notified by the insured within thirty days of when the administrative proceedings were instituted as required by the endorsement; Matulis was not an insured when Mutual was notified; and the Broad Form states that "[p]ersonal injury arising out of sexual misconduct is not covered."

The Endorsement provides that the insured must notify Mutual "within thirty (30) days from the date of an **Administrative Defense Proceeding** being **instituted** in order to receive coverage…" The BOM investigation involved two complaints, one of which was received on April 13, 2016, while the other one was submitted between March 23, 2016, and May 16, 2016. Matulis' counsel did not notify Mutual of these BOM complaints until March 20, 2017,[16] nearly a year after the first investigation was instituted. Mutual was **never** notified of the CAMC investigation by either Matulis or his counsel. According to Matulis, he reasonably believed that Mutual had been notified of at least the BOM proceedings by a third party.

In Syllabus Point One of *Colonial Insurance Co. v. Barrett*, 208 W. Va. 706, 542 S.E.2d 869 (2000), the SCAWV held that "[a] provision in an insurance contract requiring a policyholder to give the insurance company notice of a claim may be satisfied when notice of a potential claim is provided to a claims representative for the insurance company regardless of whether it was the policyholder who provided the notice." If notice is late, whether provided by the insured or someone else, "several factors must be considered before the Court can determine if the delay in notifying the insurance company will bar the claim against the insurer." *Id.* at Syl. Pt. 2.

---

[16] On March 20, 2017, Matulis' counsel forwarded to Mutual a March 13, 2017, "Complaint, Notice of Hearing, Pre-Hearing Deadlines and Protective Order" from BOM.

Assuming notice was actually provided to Mutual, and it was not timely, there is a two-step inquiry when determining whether a late notice precludes coverage. *Travelers Indem. Co. v. U.S. Silica*, 237 W. Va. 540, 546, 788 S.E.2d 286, 292 (2015). First, the court must consider the length of the delay and whether it was reasonable. *Id*. If it was not reasonable, then the inquiry ends there, and there is no coverage. *Id*. If the delay was reasonable, then the burden shifts to the insurer to show that it was prejudiced. *Id*. "Absent a demonstration of reasonableness, the burden does not shift to the insurer to prove that it was prejudiced by the delayed notice, and the inquiry necessarily ends with a finding that coverage is precluded by the insured's failure to comply with the policy's notice provision." *Id*. at 548, 788 S.E.2d at 294; s*ee also Colonial Ins. Co. v. Barrett*, 208 W. Va. 706, 713, 542 S.E.2d 869, 876 (2000) (because the delay seemed reasonable, the burden shifted to the insurer to show that late notice prejudiced its investigation and defense). Where notification is provided by a third party, instead of by the insured, the court will review whether any delay by the third party was reasonable. *See id.* (holding that the notice requirement had been met when there was a timely notice by a third party even though the insured had never notified the insurer).

Whether a delay in providing notice is reasonable is usually a question of fact for the jury to determine. *Id.* at 712, 542 S.E.2d at 875; *Travelers Indem. Co. v. U.S. Silica,* 237 W. Va. at 547, 788 S.E.2d at 293; *State Auto. Mut. Ins. Co. v. Youler*, 183 W. Va. 556, 561, 396 S.E.2d 737, 742 (1990). But where "the length of the delay is substantial or the proffered reason for the delayed notice is simply untenable, reasonableness 'may be

50

determined as a matter of law where the evidence, construing all inferences in favor of the insured, establishes that the [delay] was unreasonable or in bad faith.'" *Travelers Indem. Co. v. U.S. Silica,* 237 W. Va. at 547, 788 S.E.2d at 293.

In its Memorandum Opinion and Order of May 12, 2023, the circuit court did not explain its ruling on the timeliness of notice or indicate what evidence it might have reviewed and relied on in sufficient detail for us to conduct meaningful appellate review.[17] Significantly, the order does not make any findings as to whether Mutual received actual notice of any administrative claims within thirty days, who might have provided such notice, or when. Nor does it expressly make any findings as to the length of any delay or whether such delay was reasonable. The circuit court did conclude that Matulis reasonably believed that Mutual had actual notice of the claims (apparently from a third party) but did not state the basis for this conclusion, or indicate when Matulis came to this conclusion, when or if he eventually realized that this conclusion was wrong, or when he believed that Mutual received such notice. The circuit court opined that even if the notice was not timely,

---

[17] "DR. MATULIS' RESPONSE IN OPPOSITION TO WEST VIRGINIA MUTUAL INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT" filed in the circuit court alleges at page 3 that "on April 21, 2016, the Mutual sent a letter denying coverage for the T.W. complaint, which expressly alleged that the incident had created licensing ramifications for Dr. Matulis. The Mutual was therefore aware of Dr. Matulis' licensing issues no later than that date." This letter was not included in our record on appeal, and it is not clear whether it was contained in the circuit court's record. Moreover, even the statement contained in this circuit court pleading does not claim that Mutual had notice of the administrative proceedings concerning hospital privileges, or that proceedings to revoke Matulis' license had actually been instituted as of April 26, 2016.

51

Mutual failed to demonstrate "sufficient prejudice." But if Matulis failed to establish that his delay was reasonable, then there was no need to show prejudice.

The circuit court erred in failing to make findings concerning when and if Mutual was notified of any administrative proceedings; whether the delay was reasonable if notice was not provided within thirty days; and if any such delay was reasonable, whether Mutual suffered any prejudice.

In addition to arguing that notice of the administrative proceedings was late in the case of the BOM investigation, and nonexistent in the case of the CAMC investigation, Mutual argues that Matulis was not an Insured when his counsel notified Mutual, and that being an Insured was a requirement for coverage. The Policy states that it "applies only to **claim(s)** that arise out of a **medical incident** which occurs on or after the **retroactive date** stated in the **policy declarations** and **schedule of insureds** that are first made against an insured and reported to the Company by the insured during the **policy period**." Matulis could report claims that arose from medical incidents occurring between the retroactive date of July 1, 1994, and May 16, 2016, when he surrendered his license and was no longer covered by the policy. Thus, he would not qualify for coverage when his counsel notified Mutual on March 20, 2017, if that were the first notice received by Mutual. Whether Matulis was an insured when his administrative claims were reported depends on when, if ever, Mutual received notice, either from Matulis himself or some other person.

52

Finally, Mutual argues that personal injury arising from sexual conduct was not covered by the broad form endorsement for administrative proceedings. Matulis responds that it was, relying on the definition of "Administrative Defense Proceedings" which includes "[a] claim or investigation instituted by a patient of Yours, alleging sexual misconduct or harassment by You in the course of providing professional services to such patient." The language of the endorsement is arguably ambiguous, but the circuit court did not address this issue, so we will not consider it on appeal.

## C. *Hayseeds* **Attorney Fees**

Under Syl. Pt. 1 of *Hayseeds, Inc. v. State Farm Fire & Cas.*, 177 W. Va. 323, 352 S.E.2d 73 (1986), an insured who "substantially prevails" may recover reasonable attorney fees for vindicating his or her claims, along with damages for aggravation and inconvenience, and "net economic loss caused by the delay in settlement." *Hayseeds* does not authorize recovery of attorney fees incurred for pursuing a bad faith claim against the insurer.

Matulis' counsel requested, and the circuit court awarded, $523,138.19 in attorney fees pursuant to *Hayseeds* (the base amount was $366,524 with a 20% upward adjustment). Mutual argues that the fee award under *Hayseeds* may have included some fees related to hours that were not necessary to recover benefits under the policy, such as hours related to defending the underlying claims, hours related to potential bad faith claims, and hours for which fees were already awarded. Mutual asserts that the circuit court should

53

have parsed out the entries that could not have been recovered, relying on *Moses Enterprises, LLC v. Lexington Insur. Co*., 66 F.4th 523, 529 (4th Cir. 2023) (emphasis added), where the fourth circuit remanded a case "[b]ecause the district court committed legal error in awarding Moses the full amount of its requested fees without determining whether any of the work was properly attributed *only* to the *Jenkins* [bad faith] claim [.]" The *Moses* court recognized that a bad faith claim might be "so intertwined with their work on the breach of contract claim that some (or all) of the time cannot be disentangled." *Id.* In this case, some of the entries do look like they might be related to a potential bad faith claim, or some other matter where *Hayseeds* fees might not be appropriate. On remand, the circuit court should carefully examine the fees requested to determine what should be awarded and what should not.

In addition to arguing that some entries were not recoverable, Mutual also argued that Matulis was not entitled to an upward adjustment of twenty percent of the base fees because the court should not have considered the amount of the settlements paid in the underlying cases, and because the court said that a fee equal to one third of the insurance limits, which were $3 million,[18] would be presumptively reasonable. Because it will be necessary for attorney fees to be recalculated, we do not address whether these upward adjustments were appropriate in this case.

---

[18] Mutual allegedly paid $3.5 million to settle the underlying claims, which was half a million more than the policy limit.

Given our ruling, which recognizes a duty to defend some cases but not others, the question arises as to how to determine whether Matulis has substantially prevailed in this litigation, and if so, how to award attorney fees. Should the legal proceedings be treated as one matter for *Hayseeds* purposes because there was one policy, one declaratory judgment action, one plaintiff and one defendant? Or should each underlying lawsuit against Matulis be treated as a separate action under *Hayseeds*? If one considers the matter as a single piece of litigation, should one look at how many underlying lawsuits Matulis prevailed on, or consider the number of plaintiffs, because some lawsuits had more plaintiffs than others? Understandably, these issues were not briefed or argued on appeal because the parties believed that all the cases would stand or fall together. Moreover, we do not know whether Matulis kept separate hours for each underlying lawsuit or aggregated all the fees for the declaratory action. In the latter case, it would be necessary to allocate fees among the underlying actions in some way. These issues are not ripe for appellate review, so we leave it to the circuit court to determine whether Matulis has substantially prevailed, whether attorney fees are to be allocated among the underlying lawsuits, and if so, how.

## D. Evidentiary Rulings at the *Hayseeds* Trial

### 1. Exclusion of Evidence Concerning Sexual Abuse

Mutual complains that it was not allowed to produce voluminous documentary evidence related to Matulis' sexual abuse of patients, "including documents related to proceedings before the BOM, documents relating to Matulis' suspension from

CAMC, attorney fee invoices, attorney fee summaries, and documents relating to his criminal conviction." Moreover, Mutual "was not allowed to mention the nature of the claims, the basis for its decision making, nor the fact that the Mutual did provide Matulis a defense in many of the claims" and "was prevented from offering evidence that it settled the underlying sexual abuse claims." Allegedly, "[i]n precluding this evidence, the circuit court mislead the jury into thinking that the only fees incurred included those for which the circuit court previously determined the Mutual was liable—not fees for Matulis' criminal defense or asset protection." We conclude that the circuit court abused its discretion in refusing to allow Mutual to present any evidence concerning sexual abuse.

### 2. Exclusion of Other Evidence Concerning Annoyance, Inconvenience, and Emotional Distress

At trial, the jury was asked to award damages for the annoyance, inconvenience, and emotional distress related to Mutual's denial of a defense but was not allowed to consider other events and circumstances which might have caused or contributed to his annoyance, inconvenience, and emotional distress. Moreover, his attorneys were primarily concerned with the coverage issue, and he trusted them to make decisions. We hold that Mutual should have been allowed to put on evidence of other matters that might have caused or contributed to emotional distress, such as the investigation and loss of Matulis' hospital privileges, the investigation and loss of his medical license, the complaints filed by his patients and their lawsuits, and his criminal

56

investigation, prosecution, and incarceration. The circuit court erred in excluding such evidence.

### 3. Admission of Evidence Concerning Acquisition by MagMutual and MagMutual's Assets

During the *Hayseeds* trial, Matulis was allowed to cross-examine Ms. Huffman on the acquisition of Mutual by MagMutual, and on MagMutual's size, reserves, and assets. Among other things covered during cross-examination, Matulis brought out that MagMutual was the largest mutual insurer of physicians in the United States, with reserves of $966 million, and total assets of $2 billion. Mutual contends that this information was irrelevant because Mutual made its decision to deny a defense before it was purchased by MagMutual and because punitive damages were not at issue at this stage of the proceedings. Matulis responds that MagMutual would be responsible for any judgment against Mutual and that Mutual "opened the door" when it attempted to characterize itself as a small local company created to provide coverage to West Virginia physicians who might not be able to obtain it otherwise.

We agree that Mutual opened the door to this line of inquiry and therefore the circuit court did not abuse its discretion in allowing some cross-examination concerning the size, assets and reserves of MagMutual. This issue concerning the proper scope of cross-examination may not recur on remand, because Mutual may decide not to present Ms. Huffman as a witness or may conduct her direct examination differently. Given that

57

the circuit court must exercise its discretion in the context of how cross-examination proceeds, we do not hold that such cross-examination would always be proper but remind the circuit court that it must be sensitive to the prejudicial effect that evidence of MagMutual's financial resources may have, and that it must carefully weigh possible prejudice against the probative value of such evidence.

### E. Net Economic Loss From the Sale of Property to Pay Attorney Fees

According to Matulis, he purchased his property in North Carolina in 2009 for $300,000.00. In 2017, he sold this property for $360,000.00 to raise money to pay his attorneys. No appraisal was done prior to this sale, and no evidence was ever presented at trial concerning the value of the property at the time of sale. In his report, Matulis' appraisal expert indicated that the value of the property as of July 4, 2022, was $600,000.00. Over the objection of Mutual, the appraiser was allowed to testify at trial that the value of the property as of May 15, 2023, was $700,000.00. The jury awarded $200,000.00 for net economic loss concerning the sale of this land. Mutual argues that the loss associated with this sale, if any, would have been the difference between the price Matulis received for the land, and its value at the time of sale. Because there was no evidence concerning the value of the land when it was sold, the jury should not have been allowed to award damages for net economic loss because it had no basis for doing so. Mutual argues that the jury was essentially asked and allowed to award damages for lost opportunity rather than net economic loss. We agree. Matulis' net economic loss, if any, would be the difference between the money paid for the property, and the market value of the property at the time

of its sale in October 2017. The circuit court erred in awarding damages for net economic loss without any evidence of the value of the property at the time of sale.

We turn next to the question of whether it was necessary for Matulis to sell his property to pay attorney fees he was forced to incur because of Mutual's refusal to defend some of his lawsuits brought by former patients. Some of his attorney fees were incurred for matters that were clearly not covered by the policy or broad form endorsement, such as any defense costs, in excess of $25,000.00, associated with administrative proceedings related to licensing[19] and hospital privileges. Similarly, Matulis was not entitled to recover attorney fees for criminal defenses, bankruptcy, asset protection, or litigating a coverage action against another carrier. There was no evidence presented as to how Matulis used the proceeds from the sale of his lakefront property. Mutual should have been allowed to cross-examine Matulis concerning how he spent the proceeds from the sale. Mutual should also have been allowed to inquire about other financial demands which may have contributed to his decision to sell the lakefront property.[20] The circuit court erred in refusing to allow this cross-examination.

---

[19] According to a chart at page 9 of Respondent's Corrected Brief, the attorney fees related to administrative proceedings exceeded the limit of $25,000 by $72,339.00.

[20] Mutual also alleges that Matulis' expert should not have been allowed to testify concerning the current value of the property at the time of trial because it had not been previously disclosed. We need not address this disclosure issue, having concluded that the relevant value was the value of the property at the time of sale.

**F. Prejudgment Interest**

The jury determined that Matulis was entitled to prejudgment interest for breach of contract damages, but the circuit court calculated the amount of prejudgment interest to be awarded. Mutual argues that the jury was required to determine not just whether such interest should be awarded, but the amount thereof. Matulis argues that it was appropriate for the circuit court to calculate the amount of prejudgment interest because it involved nothing more than an arithmetic operation prescribed by statute. Moreover, Mutual has not argued that a different formula should have been followed. We hold that it was appropriate for the court to determine the amount of prejudgment interest because that process involved nothing more than a mechanical calculation.

## IV.    CONCLUSION

We affirm in part, reverse in part, vacate in part, and remand this matter for further proceedings consistent with this opinion.

Affirmed, in part, Reversed, in part, Vacated, in part, and Remanded.